David E. Bower SBN 119546
Barbara A. Rohr SBN 273353
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: dbower@faruqilaw.com
        brohr@faruqilaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENT TALBERT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MATTSON TECHNOLOGY, INC., FUSEN E. CHEN, KENNETH KANNAPPAN, RICHARD E. DYCK, SCOTT KRAMER, DOUGLAS SCOTT PETERSON, KENNETH G. SMITH, and THOMAS ST. DENNIS,<br><br>Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. **VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9**<br>2. **VIOLATIONS OF SECTION 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934** |

## CLASS ACTION COMPLAINT

Brent Talbert ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1.     This is a class action brought by Plaintiff on behalf of himself and the other public stockholders of Mattson Technology, Inc. ("Mattson" or the "Company"), other than Defendants and their affiliates, against Mattson and the members of its board of directors (the "Board" or the "Individual Defendants," and together with Mattson, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a),  and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between Mattson and Beijing E-Town Dragon Semiconductor Industry Investment Center (Limited Partnership) ("E-Town Dragon").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading proxy statement (the "Proxy") to be filed with the SEC.   The Proxy recommends that Mattson stockholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Mattson will merge with Dragon Acquisition Sub, Inc. ("Merger Sub") and become an indirect subsidiary of E-Town Dragon.   The stockholder vote is currently scheduled for March 23, 2016.   Pursuant to the terms of the definitive agreement and plan of merger these entities entered into (the "Merger Agreement"), Mattson stockholders stand to receive only $3.80 in cash for each share of Mattson common stock they own (the "Merger Consideration").

3.     As discussed below, the Merger Consideration and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other common stockholders of Mattson.   Defendants have now asked Mattson's stockholders to support the Proposed Transaction in exchange for inadequate consideration based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act.   Specifically, the Proxy

1    contains materially incomplete and misleading information concerning: (i) the sales and

2    negotiation process, including whether certain interested parties are subject to standstills and the

3    identity of the individuals involved in negotiations for E-Town Capital; (ii) the financial analyses

4    conducted by Morgan Stanley & Co. LLC ("Morgan Stanley"), Mattson's financial advisor; and

5    (iii) estimated forecasts of the Company's future financial performance prepared by Mattson's

6    management (collectively, the "Forecasts").

7        4.    For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin the

8    stockholder vote on the Proposed Transaction unless and until the material information discussed

9    below is disseminated to Mattson's stockholders. In the event the Proposed Transaction is

10    consummated without the material omissions referenced below being remedied, Plaintiff seeks to

11    recover damages resulting from the Defendants' violations of the Exchange Act.

12                            **JURISDICTION AND VENUE**

13        5.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

14    Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

15    violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

16        6.    Personal jurisdiction exists over each Defendant either because the Defendant

17    conducts business in or maintains operations in this District, or is an individual who is either

18    present in this District for jurisdictional purposes or has sufficient minimum contacts with this

19    District as to render the exercise of jurisdiction over Defendant by this Court permissible under

20    traditional notions of fair play and substantial justice.

21        7.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C.

22    § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an

23    effect in this District; (ii) Mattson maintains its primary place of business in this District; (iii) a

24    substantial portion of the transactions and wrongs complained of herein, including Defendants'

25    primary participation in the wrongful acts detailed herein, occurred in this District; and (iv)

26    Defendants have received substantial compensation in this District by doing business here and

27    engaging in numerous activities that had an effect in this District.

28

**CLASS ACTION COMPLAINT**

## PARTIES AND RELEVANT NON-PARTIES

8.      Plaintiff is, and has been at all relevant times, the owner of Mattson common stock and has held such shares since prior to the wrongs complained of herein.  Plaintiff is a citizen of Kansas.

9.      Defendant Mattson is incorporated under the laws of Delaware and maintains its principal executive offices in Fremont, California.  The Company designs, manufactures, markets and globally supports semiconductor wafer processing equipment used in the fabrication of integrated circuits. Mattson is a key supplier of processing equipment used in the global semiconductor industry, and operates primarily in four product sectors: dry strip, etch, conventional rapid thermal processing and millisecond anneal.

10.     Individual Defendant Fusen E. Chen ("Chen") has served as the Company's President and Chief Executive Officer and director since February 2013.  From September 2009 to June 2012, Chen was Executive Vice President at Novellus Systems, Inc. ("Novellus"), a semiconductor equipment manufacturer.  From October 2005 to September 2009, Chen was the Chief Technology Officer at Novellus, with the responsibility for defining the company's technology strategy and direction.  Prior to joining Novellus, Chen spent 10 years at Applied Materials, Inc.  Chen also served on the Board of Directors of RDA Microelectronics, Inc., a publicly-traded fabless semiconductor company, from December 2012 through its merger in July 2014.  Chen is a citizen of California.

11.     Individual Defendant Kenneth Kannappan ("Kannappan") has served as a director of the Company since July 1998, and served as Chairman of the Board since July 2012 and from June 2008 to September 2011.  Since January 1999, Kannappan has served as President and Chief Executive Officer of Plantronics, Inc., a telecommunications equipment manufacturer, and also serves as a member of its board of directors.  From 1995 to 1998, Kannappan held various executive positions at Plantronics, Inc.  Prior to joining Plantronics, Inc., Kannappan was Senior Vice President of Kidder, Peabody & Co. Incorporated, an investment banking company, from 1985 to 1995. Kannappan also currently serves on the board of directors of Integrated Device Technology.  Kannappan is a citizen of California.

**CLASS ACTION COMPLAINT**

12.     Individual Defendant Richard E. Dyck ("Dyck") has served as a director of the Company since January 2010.  Dyck was the founder of and has since 2009 served as President of TGK, K.K., a supplier of connection systems for the testing of semiconductors.  Previously, Dyck was the founder and President of TCS Japan K.K. and East Asia Connector Services, Ltd (Shanghai), manufacturers of high-speed connection systems, until they were each acquired in 2009.  From 1982 until 1999, Dyck was a Vice-President and an Executive Officer of Teradyne, Inc., a semiconductor test equipment company, and the Chairman of Teradyne, Japan.  Dyck is a member of the Advisory Committee of the Japan External Trade Organization.  Dyck is a citizen of Ohio.

13.     Individual Defendant Scott Kramer ("Kramer") has served as a director of the Company since September 2011 and has served as Chairman of the Company's Nominating and Governance Committee since September 2013.  Kramer retired as vice president of manufacturing technology at SEMATECH, Inc. in 2011, a position he had held since 2008. Kramer held various positions of increasing responsibility at SEMATECH, from 1994 to 1997 and from 1998 to 2011.  Prior to joining SEMATECH, he worked for LAM Research and IBM. Kramer is a citizen of Texas.

14.     Individual Defendant Douglas Scott Peterson ("Peterson") has served as a director of the Company since December 2010 and has served as the Chairman of the Company's Audit Committee since December 2010.  Peterson was the Managing Partner of Ernst & Young's Pacific Northwest Area Assurance (Audit) Practice until his retirement in April 2010.  In his various roles at Ernst & Young, Peterson served as the lead advisory partner for many of the firm's technology clients.  Peterson also served as a Practice Fellow at the Financial Accounting Standards Board from 1987 to 1989.  Since December 2013, Peterson has served on the Board of the Utah Capital Investment Corporation and presently serves as Chairman of that Board. Peterson is a citizen of Utah.

15.     Individual Defendant Kenneth G. Smith ("Smith") has served as a director of the Company since August 1994 and has served as Vice Chairman of the Board since July 2012. Smith also served as Chairman of the Company's Compensation Committee since May 2011.

**CLASS ACTION COMPLAINT**

1  Smith is a retired President, Chief Operating Officer and a director of WaferTech, a
2  semiconductor manufacturer, where he served from May 1996 until April 2000.  From 1991 to
3  1995, Smith was Vice President of Operations at Micron Semiconductor, Inc., a semiconductor
4  manufacturer.  Smith is a citizen of Florida.

5          16.     Individual Defendant Thomas St. Dennis ("St. Dennis") has served as a director
6  since September 2013 and has served as Chairman of the Company's Strategy and Acquisition
7  Committee since March 2014.  St. Dennis was Chief Executive Officer of FormFactor, Inc. from
8  September 2010 to December 2014 and continues to serve as a board member since September
9  2010.  St. Dennis previously held various positions at Applied Materials, Inc. from 1992 to 1999
10  and again from 2005 to 2009.  From 2003 to 2005, Mr. St. Dennis held the position of Executive
11  Vice President of Sales and Marketing at Novellus Systems, Inc.  St. Dennis is a citizen of
12  California.

13          17.     Non-party E-Town Dragon is a People's Republic of China ("PRC") limited
14  partnership.  E-Town Dragon is a private equity fund based in Beijing.  E-Town Dragon, led by
15  E-Town Capital, focuses on investments in the semiconductor industry.

16          18.     Non-party Beijing E-Town International Investment & Development Co., Ltd.
17  ("E-Town Capital") is a limited liability company organized under the laws of the PRC, is the
18  indirect parent of E-Town Dragon, is an enterprise registered in the Beijing Economic-
19  Technological Development Area and plays an active role in funding investments to its portfolio
20  companies residing in the Beijing Economic-Technological Development Area.

21          19.     Non-party Dragon Acquisition Sub, Inc., (Merger Sub) is a Delaware corporation
22  and a wholly-owned subsidiary of E-Town Dragon, and was formed for the purpose of
23  effectuating the Proposed Transaction.

24                              **SUBSTANTIVE ALLEGATIONS**

25  **The Proposed Transaction Undervalues Mattson**

26          20.     Mattson designs, manufactures, markets and globally supports semiconductor
27  wafer processing equipment used in the fabrication of integrated circuits ("ICs" or chips).  The
28  Company is a key supplier of plasma and rapid thermal processing equipment to the global

                                          5
                         **CLASS ACTION COMPLAINT**

semiconductor industry, and operate in four primary product sectors: dry strip, etch, conventional rapid thermal processing ("RTP") and millisecond anneal ("MSA"). The Company's manufacturing equipment utilizes innovative technologies to deliver advanced processing capabilities and high productivity for the fabrication of current- and next-generation ICs.

21.     Mattson continues to focus on advancing each of its major products. The Company's etch products, specifically its *paradigmE* XP, are established process tools of record in advanced DRAM, NAND and 3D NAND production fabs. The Company is also establishing a development tool of record in advanced foundry for sub-20 nanometer front-end of line processes. The Company's RTP product portfolio, including the Helios XP for conventional RTP and the Millios for MSA, have demonstrated significant device performance improvements at various foundry and logic customers, and their superior temperature measurement and control capability, combined with the Company's technology to address thermal related non-uniformities at the device level, continues to grow its RTP business. The Company's MSA system, the Millios, has been qualified and released for sub-20 nanometer high volume advanced foundry/logic production at multiple manufacturing sites. The Company's dry strip products continue to make a steady contribution to its business as its established customers in foundry/logic and memory continue to make investments.

22.     Mattson's customer base includes memory, foundry and logic device manufacturers. The Company has a global sales and support organization focused on developing strong, long-term customer relationships. The Company has a design and manufacturing center in the United States and a design and manufacturing facility in Germany. The Company's customer sales and support teams are located in Korea, Taiwan, China, Germany, Singapore and the United States. The Company was founded in 1988 and is headquartered in Fremont, California.

23.     The Merger Consideration fails to adequately compensate Mattson stockholders in light of the Company's recent strategic achievements and strong growth prospects.

24.     Although the Company's stock price dropped during the first half of 2015 in light of a weaker than expected start to the fiscal year, that loss was largely the result of panicky

investors rather than a reflection of the Company's future prospects or inherent value.  Indeed, after bottoming-out in September, Mattson's stock price increased by approximately 40% as of the date prior to the announcement of the Proposed Transaction.

25.     Mattson has recently experienced an operational turnaround that has resulted in seven consecutive quarters of profitability.  The Company's turnaround was summarized in the following slide from a recent investor presentation:



26.     In the same presentation, the Company stated that it expected its served available market opportunity to double within 2 years, and that the entire semiconductor market is expected to experience significant growth as a result of the rapidly expanding use of smartphones.

27.     Recognizing Mattson's strong growth prospects, analysts have issued price targets significantly above the $3.80 per share Merger Consideration in recent months.  Indeed, the $3.80 per share Merger Consideration is 36% less than the $6.00 per share price target analysts at Needham & Co. issued as recently as February 2015, and 24% less than the $5.00 per share price

target analysts at B Riley & Co. issued as recently as late-October 2015. The Merger Consideration is also significantly below Mattson's 52-week high stock price of $5.10 per share.

28. The Company's strong growth prospects were also reflected by its recent financial results. On October 29, 2015, the Company announced that its net income for the third quarter exceeded previously issued guidance and represented the ninth consecutive profitable quarter. In commenting on the positive third quarter results, Individual Defendant Chen stated: "In spite of challenging industry conditions, I am pleased with our ability to achieve top line results at the high end of expectations…Further, our flexibility in managing our cost structure to align with changes in industry demand, without sacrificing our focus on our customers' success, enabled us to exceed our own expectations for profitability."

29. In sum, Mattson is well-positioned to generate significant earnings in the foreseeable future, particularly in light of its strong position within the rapidly expanding semiconductor industry. Despite Mattson's bright financial prospects, the Board has now agreed to sell the Company at a time when its stock price does not accurately reflect the Company's intrinsic value and growth prospects, to the detriment of Mattson's common stockholders.

**The Individual Defendants Will Reap Personal Financial Gain from the Proposed Transaction While Mattson Stockholders Will Be Cashed Out for Inadequate Consideration**

30. Each of the Individual Defendants will reap significant personal financial gain if the Proposed Transaction is consummated. Thus, they each have a personal interest to ensure that Mattson's stockholders vote to approve the Proposed Transaction despite the fact that it provides Mattson's public stockholders with inadequate consideration.

31. Specifically, each of the Individual Defendants will receive significant cash payments as a result of the accelerated vesting of their restricted stock and other "change in control" payments.

32. Pursuant to the Merger Agreement, each outstanding option to purchase shares of the Company's common stock ("Company Option") and restricted stock unit ("RSU") held by a non-employee member of the Board (i.e. all the Individual Defendants besides Chen) will be

**CLASS ACTION COMPLAINT**

converted into the right to immediately receive the Per Share Merger Consideration.  The table below summarizes these special payments that only Individual Defendants Kannappan, Smith, Peterson, Dyck, Kramer, and St. Dennis will receive:

| Name | Shares Held (#) | Shares Held ($) | Options Held (#) | Options Held ($) | RSUs Held (#) | RSUs Held ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Fusen Chen | 228,837 | 869,581 | 585,000 | 1,098,350 | 326,250 | 1,239,750 | 3,207,681 |
| James Michael Dodson | 91,418 | 347,388 | 625,000 | 1,342,800 | 69,375 | 263,625 | 1,953,813 |
| Hoang Hoang | 105,980 | 402,724 | 230,000 | 366,050 | 88,125 | 334,875 | 1,103,649 |
| Tyler Purvis | 38,326 | 145,639 | 255,000 | 514,700 | 43,125 | 163,875 | 824,214 |
| Kenneth Kannappan | 115,125 | 437,475 | 110,500 | 211,760 | 25,875 | 98,325 | 747,560 |
| Kenneth Smith | 28,625 | 108,775 | 112,500 | 217,600 | 26,375 | 100,225 | 426,600 |
| Scott Peterson | 25,625 | 97,375 | 82,500 | 154,600 | 26,375 | 100,225 | 352,200 |
| Richard Dyck | 112,525 | 427,595 | 88,500 | 147,920 | 24,875 | 94,525 | 670,040 |
| Scott Kramer | 8,125 | 30,875 | 78,500 | 177,240 | 24,875 | 94,525 | 302,640 |
| Thomas St. Dennis | 7,375 | 28,025 | 37,500 | 42,750 | 26,125 | 99,275 | 170,050 |

33.   Thus, each of these Individual Defendants will receive hundreds of thousands of dollars in special payments as a result of the Proposed Transaction.

34.   These payments are particularly significant here, because, according to the Proxy, E-Town Capital was reluctant to agree to the accelerated vesting of outstanding Company Options and RSUs.  Specifically, on August 22, 2015, unidentified representatives of the Company told E-Town Capital that they believed equity awards should be accelerated and cashed out at the closing of the Proposed Transaction.  Nevertheless, E-Town Capital refused.  On November 23, 2015, the Board once again discussed E-Town Capital's refusal to adopt a provision that would accelerate vesting and cash-out all equity incentives, and discussed whether E-Town Capital's position should prevent the Company from continuing to engage in discussions with E-Town Capital.  The Board ultimately agreed to finalize a deal with E-Town Capital, so long as they would personally have their Company Options and RSUs accelerated at closing.  In other words, Individual Defendants Kannappan, Smith, Peterson, Dyck, Kramer, and St. Dennis negotiated special treatment of their own personal Company Options and RSUs, which will provide them with lucrative payouts, renders them conflicted, and caused them to support the Proposed Transaction despite the inadequate Merger Consideration Mattson's public stockholders stand to receive.

35.     Individual Defendant Chen and others members of Mattson management will also profit significantly from the Proposed Transaction.  Although the Proxy states that neither Chen nor any other executive officers have entered into employment agreements with, or the right to purchase equity of, the Surviving Corporation, they are free to do so.  And, based on E-Town Capital's stated desire to have employees remain with the Company after closing, it is likely that Chen and other executive officers will remain on with the Surviving Corporation, and will thus keep their lucrative jobs.  Thus, Chen and Mattson's executive officers were not particularly concerned with the fact that their Company Options and RSUs may not accelerate upon the closing of the Proposed Transaction, as they are likely to remain on with the Surviving Corporation.

36.     And, in the event that Chen or other executive officers decide not to remain with the Surviving Corporation, they will receive lucrative payouts in the form of golden parachute compensation.  Specifically, Chen will receive more than $3.63 million in golden parachute compensation in the event his employment is terminated upon the consummation of the Proposed Transaction.

37.     Another member of management who was intricately involved in the sales and negotiation process, including preparing the Company's Forecasts, James Michael Dodson, Mattson's Chief Financial Officer and Chief Operating Officer, will receive $1,021,268 in golden parachute compensation in the event his employment is terminated upon the consummation of the Proposed Transaction.

38.     The inadequate sales process was thus tainted by these personal financial benefits which are unique to the Individual Defendants and not shared by Mattson's public stockholders.  As a result of these personal financial benefits, the Individual Defendants were motivated to agree to the Proposed Transaction despite the fact that it fails provide fair consideration to Mattson's public stockholders.  Indeed, because the Individual Defendants acquired their Company Options and RSUs at prices significantly below the fair value of Mattson's public stock, the Merger Consideration still represents an acceptable return to them.  It is therefore

**CLASS ACTION COMPLAINT**

imperative that Mattson's stockholders receive the material information referenced below, so that the can cast a fully informed vote on the Proposed Transaction.

**The Preclusive Deal Protection Provisions**

39.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Mattson.

40.     First, the Merger Agreement contains an onerous no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Mattson's stockholders.   Specifically, section 5.2 of the Merger Agreement states that the Company and the Individual Defendants shall not:

    i)     solicit, initiate or induce the making, submission or announcement of, or knowingly encourage, facilitate or assist, an Acquisition Proposal,

    ii)    furnish to any Person (other than Parent, Acquisition Sub or any designees of Parent or Acquisition Sub) any non-public information relating to the Company or any of its Subsidiaries, or afford to any Person (other than Parent, Acquisition Sub or any designees of Parent or Acquisition Sub) access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company or any of its Subsidiaries, in any such case with the intent to induce the making, submission or announcement of, or the intent to encourage, facilitate or assist, an Acquisition Proposal or the making of any inquiry or proposal that would reasonably be expected to lead to an Acquisition Proposal,

    iii)   participate or engage in discussions or negotiations with any Person (other than Parent, Acquisition Sub or any designees of Parent or Acquisition Sub) with respect to an Acquisition Proposal or;

    iv)   enter into any Contract contemplating or otherwise relating to an Acquisition Transaction (other than an Acceptable Confidentiality Agreement).

41.     Additionally, Section 6.6 of the Merger Agreement grants E-Town Dragon recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four business days to negotiate with Mattson, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

42.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from

expending the time, cost, and effort of making a superior proposal while knowing that E-Town Dragon can easily foreclose a competing bid.  As a result, these provisions unreasonably favor E-Town Dragon, to the detriment of Mattson's public stockholders.

43.     Lastly, Article IX of the Merger Agreement provides that Mattson must pay E-Town Dragon a termination fee of $8.58 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee is unreasonably high given Mattson's size and the value of the Proposed Transaction.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Mattson's stockholders with a superior offer.

44.     Ultimately, these preclusive deal protection provisions restrain Mattson's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

45.     Given that the preclusive deal protection provisions in the Merger Agreement virtually ensure that a superior offer will not emerge, it is imperative that Mattson's stockholders receive all material information necessary for them to cast a fully informed vote at the stockholder meeting concerning the Proposed Transaction.

**The Materially Incomplete and Misleading Proxy**

46.     On February 17, 2016 Defendants filed the Proxy with the SEC.  The Proxy omits certain material information concerning the fairness of the Proposed Transaction and Merger Consideration.  Without such information, Mattson stockholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

### *Background of the Merger Section*

47.     First, with respect to the *Background of the Merger* section, the Proxy fails to indicate: (a) whether the non-disclosure agreement Mattson entered into with Company B contained a standstill provision and, if so, when the provision expires; and (b) whether the non-disclosure agreements with Company A, Company B, and the Interested Chinese Semiconductor Company contain any terms that could impact each party's ability to negotiate with the Board and submit a superior proposal.  The omission of this information renders the portion of the

Proxy identifying one of the Board's "reasons for the Merger and recommendation" to be "the Company's ability…to terminate the merger Agreement during certain periods prior to the completion of the Merger to accept any acquisition proposal from a third party that is a superior proposal" misleading, because without knowing whether the parties that previously expressed interest in a transaction have the ability to make an unsolicited superior offer, stockholders are unable to determine whether the Board's ability to accept a superior acquisition proposal is severely impeded by the fact that the parties most likely to submit a superior proposal are contractually prohibited from doing so.

48.     Further, the Proxy is materially incomplete and misleading because it fails to identify by name any of the "senior management of E-Town Capital" who were involved in the strategic review and negotiation process.  Because E-Town Capital is a private entity controlled by the Chinese government, public information about its organization and management is virtually nonexistent.  Accordingly, Mattson stockholders have no way to determine whether any members of Mattson management or the Board have had previous or ongoing relationships with the representatives of E-Town Capital they were negotiating with.   The omission of this information renders the statements in the Proxy concerning the adoption of a "management neutrality policy" misleading, because the statements create the impression that management remained neutral with respect to any strategic bidders, but stockholders have no way of determining whether there are any relationships between representatives of E-Town Capital and Mattson that caused Mattson to favor a deal with E-Town Capital.

### *Summary of Morgan Stanley's Financial Analyses Section*

49.     With respect to Morgan Stanley's *Equity Research Analysts' Future Price Targets* analysis, the Proxy states that "the range of undiscounted analyst price targets for our common stock was $3.00 to $3.75 per share as of December 1, 2015."   This statement is materially misleading, because at least one analyst covering the Company issued an $8.50 long-term, 12 month high price target and a $6.15 long-term, 12 month mean and median target, which this section of the Proxy fails to disclose.

**CLASS ACTION COMPLAINT**

50.     With respect to Morgan Stanley's *Public Trading Comparables Analysis*, Morgan Stanley first selected a sizeable list of eleven "Comparable Companies."  In so doing, Morgan Stanley was able to start off with a wide range of multiples.  Morgan Stanley then "selected representative ranges of revenue, Adjusted EBITDA, and price to earnings multiples…" from the overall population of multiples it observed for the eleven Comparable Companies.  Morgan Stanley's "selection" was purportedly based upon its "professional judgment and experience." This section of the Proxy is materially misleading because it fails to disclose the individually observed multiples for each of the Comparable Companies, and fails to disclose the range, mean, and median multiples for the overall population of Comparable Companies.  Instead, the Proxy only discloses the "selected" comparable company multiple ranges Morgan Stanley applied, which were selected from the overall population of multiples for all eleven companies.  This information is material to Mattson stockholders ability to observe flaws in Morgan Stanley's analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration.  The omission of this information renders Morgan Stanley's s implied value per share ranges and the statements that the Merger Consideration is "fair" misleading.  Without the omitted information, Mattson stockholders are unable to determine whether the ranges accurately reflect the value of their Mattson shares.

51.     With respect to Morgan Stanley's *Precedent Transactions Analysis*, Morgan Stanley first selected a huge list of 62 "comparable" transactions.  In so doing, Morgan Stanley was able to start off with an extraordinarily wide range of multiples.  Morgan Stanley then "selected representative ranges of implied premia and financial multiples of the transactions…" from the overall population of multiples it observed for the 62 comparable transactions.  Morgan Stanley's "selection" was purportedly based upon its "professional judgment and experience." This section of the Proxy is materially misleading because it fails to disclose the individually observed multiples and premia for each of the comparable transactions, and fails to disclose the range, mean, and median multiples and premia for the overall population of comparable transactions.  Instead, the Proxy only discloses the "representative ranges" of comparable transactions multiples and premia Morgan Stanley applied, which were selected from the overall

population of multiples and premia for all of the comparable transactions.  This information is material to Mattson stockholders ability to observe flaws in Morgan Stanley's analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration.  The omission of this information renders Morgan Stanley's s implied value per share ranges and the statements that the Merger Consideration is "fair" misleading.  Without the omitted information, Mattson stockholders are unable to determine whether the ranges accurately reflect the value of their Mattson shares.

52.     Individual multiples and/or the range, mean and median multiples observed for *each* of the comparable companies and comparable transactions are routinely disclosed in merger proxies.  The omission of such information here is therefore particularly egregious, and Defendants intentionally omitted such information to obfuscate Morgan Stanley's analyses.

53.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the inputs and assumptions used to derive the discount rate Morgan Stanley employed in its analysis; (ii) the Company's weighted average cost of capital ("WACC"); and (iii) the Company's net operating losses ("NOLs").  In a DCF analysis, WACC is an assessment of what it costs for a company to access financing.

54.     Utilizing a higher WACC in a DCF analysis will yield a lower valuation of a company.  Here, Morgan Stanley utilized a discount rate of 10.8%, which is higher than the 8.41% average cost of capital for the semiconductor equipment industry.[1]  Thus, Morgan Stanley appears to have utilized an above-average discount rate, making the inputs and assumptions Morgan Stanley use to derive the discount rate and the Company's WACC particularly material.  Further, here, Morgan Stanley performed its analysis accounting for the NOLs and excluding the net present value of the NOLs from its calculation, which yielded lower implied per share price ranges.

55.     These metrics are thus material to stockholders' ability to observe flaws in Morgan Stanley's analysis and to assess the reliability of the DCF analysis as a measure of the

---

[1] Aswath Damodaran, *Cost of Capital by Sector (US)*,
http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/wacc.htm.

**CLASS ACTION COMPLAINT**

Company's intrinsic value and the value of their shares.  The omission of these metrics renders the implied present value per share of Mattson common stock ranges and the statements that the Merger Consideration is "fair" misleading, because without these metrics stockholders are unable to determine whether the ranges accurately reflect the value of their shares.

56.     With respect to conflicts of interest caused by Morgan Stanley's prior work for parties involved in the Proposed Transaction, the Proxy fails to disclose whether Morgan Stanley has provided any financial services to E-Town Capital or its affiliates.  E-Town Capital is the indirect parent of E-Town Dragon and plays and active role in funding investments to its portfolio companies.  E-Town Capital has guaranteed the payment and performance of the obligations of E-Town Dragon and Merger Sub under the Merger Agreement, and its representatives were directly involved in the negotiation process with Morgan Stanley.  Such information is therefore material; because of the central role Morgan Stanley played in the sales process and the determination that the Merger Consideration is fair, it is critical that Mattson stockholders receive this information, which will enable them to assess whether Morgan Stanley was conflicted.

57.     The omission of this information renders the statement in the Proxy that Morgan Stanley has not provided "any financial advisory services to the Company or to Parent" in the past two years misleading, because "Parent" is defined to refer to only E-Town Dragon, not E-Town Capital or any affiliated entities.  The Proxy is therefore unclear on whether or not Morgan Stanley has provided or is currently providing any services to E-Town Capital or any affiliated entities.  The omission of this information also renders the Proxy's assertion that Morgan Stanley determined that the Merger Consideration is fair based solely upon the "assumptions made, procedures followed, matters considered and qualifications and limitations on the scope of review undertaken…" materially misleading, because stockholders cannot currently determine if Morgan Stanley has had past engagements with E-Town Capital or affiliated entities which influenced its analyses and fairness opinion.

**CLASS ACTION COMPLAINT**

1

*__Omission of Projections for Free Cash Flow From all the Forecasts__*

2      58.     All of the summaries of the Forecasts in the "Management Projections" section of

3   the Proxy are also materially incomplete and misleading because they each fail to disclose the

4   Company's projections for free cash flow.   The omission of the free cash flow projections is

5   material and renders each of the respective Forecasts misleading because the omission of the free

6   cash flow projections prevents stockholders from realizing the relative inaccuracy of the

7   November 30th Forecast.

8      59.     Further, the free cash flow projections are particularly material here because they

9   were prepared entirely by Mattson's management and because the Merger Consideration is

10   entirely in cash; Mattson stockholders will therefore be deprived of their entire ownership stake

11   in the Company if the Proposed Transaction is consummated.

12      60.     Mattson' management's best estimate of the future cash flow of the corporation,

13   which is proposed to be sold in an all cash merger, is clearly material information.   Under sound

14   corporate finance theory, the value of stock should be premised on the expected future cash

15   flows of the corporation.   Thus, the question that Mattson investors must ask in determining

16   whether to vote for the Proposed Transaction is clear: is the price being offered now fair

17   compensation for the benefits they will receive as a stockholder from the future expected cash

18   flows of the corporation if the corporation remains as a going concern?   The trade-off here is that

19   Mattson's stockholders can get $3.80 for sure, but must forsake the value they might obtain if the

20   corporation remains independent and delivers on management's expected cash flows.

21      61.     The omission of Mattson management's cash flow projections also renders the

22   Proxy's summary of Morgan Stanley's *Discounted Cash Flow Analysis* materially incomplete

23   and misleading.   Specifically, the implied present value per share of Mattson common stock

24   ranges listed in this section of the Proxy are misleading, because without the cash flow

25   projections, stockholders do not know whether the ranges accurately reflect the value of their

26   Mattson shares.

27

28

**CLASS ACTION COMPLAINT**

1

***Promotion of the November Forecasts as More Accurate***

2          62.     The Proxy is also materially misleading with respect to the portions discussing

3   Mattson management's Forecasts.  Specifically, although the Proxy states that "the updated long-

4   term financial outlook in the November 5th Forecast reflected Company management's view of

5   the continuing decline in the semiconductor industry generally and particularly in the DRAM

6   market…" and that the "November 30th Forecast was management's best estimate of the

7   Company's future prospects…", in reality, the earlier Pre-November Forecasts (defined below)

8   represent Mattson's best estimates of its long-term prospects.  In other words, although the Board

9   had relied on and believed in the Pre-November Forecasts, knew that the decline in the DRAM

10  market is only temporary and expect the DRAM market to rebound, it nonetheless presented the

11  November 5th Forecast and November 30th Forecast (the "November Forecasts") as a more

12  accurate reflection of Mattson's' future value in the Proxy.

13         63.     The Proxy also repeatedly and misleadingly cites the "weakening DRAM

14  market," "decline in the DRAM market," "downturn in the DRAM market," and "decreased

15  demand in the DRAM market" as the basis for the significant downward revision reflected in the

16  November Forecasts.  These statements are misleading because, as explained below, Chen and

17  the other Individual Defendants expect "DRAM investment will return" or "pick up" over the

18  long-term, and thus the current temporary decline in the DRAM market did not support

19  drastically reducing management's Forecasts for later years, including 2017-2020.

20         64.     The Board intentionally revised the Company's Pre-November Forecasts

21  downward in order to create the November Forecasts so that stockholders would not know the

22  true value of their stock.  The Board then provided the November 30th Forecast to Morgan

23  Stanley to use in connection with rendering its fairness opinion, thereby ensuring that the Merger

24  Consideration fell within the implied price per share ranges Morgan Stanley derived.  The

25  fairness opinion is therefore fundamentally flawed, and creates the misleading impression that

26  the Merger Consideration is fair to Mattson stockholders based upon the intentionally

27  manipulated November Forecasts.

28

**CLASS ACTION COMPLAINT**

65. The Board inexplicably created eight different sets of Forecasts between May and November of 2015.

66. On August 17, 2015, Mattson management prepared the August 17th Forecast. The August 17th Forecast was prepared on a stand-alone basis and therefore does not reflect any effect of an acquisition of the Company or any other strategic transaction. In other words, the August 17th Forecast reflects the Company's stand-alone future business prospects, and in turn the value of the Company's stock. The August 17th Forecast contained the following projections:

**Mattson Management Projections — August 17, 2015**
($MM, except EPS)

|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Net Revenue | $186.5 | $247.0 | $327.1 | $397.2 | $474.0 |
| Gross Profit | 68.0 | 93.0 | 129.2 | 154.7 | 186.8 |
| EBITDA excluding stock based compensation [1] | 19.4 | 41.7 | 60.8 | 71.7 | 89.1 |
| Operating Income [2] | 15.0 | 35.2 | 51.4 | 59.2 | 72.8 |
| EPS [1][2] | 0.17 | 0.44 | 0.63 | 0.71 | 0.86 |
| | | | | | |
| Depreciation and Amortization | 2.6 | 3.9 | 5.9 | 8.3 | 11.3 |
| Capital Expenditures | 2.6 | 10.0 | 10.0 | 14.0 | 16.0 |
| Working Capital Increase (Ex-Cash) | 0.2 | 15.5 | 1.0 | 5.9 | 5.0 |
| Stock-Based Compensation | 2.3 | 2.9 | 3.7 | 4.5 | 5.3 |

67. On October 19, 2015, E-Town Capital informed Mattson that it was drastically lowering its proposed purchase price to $3.20 per share in cash.

68. The October 19th offer was dramatically below E-Town Capital's previous offers. On June 11, 2015, E-Town Capital had submitted an indication of interest to acquire Mattson for $4.75 to $5.25 per share, which the Board deemed inadequate and rejected.

69. On August 3, 2015, E-Town Capital submitted a revised indication of interest to acquire the Company for $4.10 per share. The Board apparently felt the $4.10 offer was actionable, yet they were inexplicably unable to finalize a deal with E-Town Capital at that price over the course of nearly three months.

70. Between June 3, 2015 and October 19, 2015, Mattson management and the Board made only minor revisions to their projections. Specifically, management and the Board prepared and/or approved the use of the June 3rd Forecast, the July 9th Forecast, the July 17th Forecast, and the August 17th Forecast (collectively, the "Pre-November Forecasts").

**CLASS ACTION COMPLAINT**

71.     Mattson management also prepared an October 7th Forecast, which purportedly reflected the long-term financial outlook of the Company based on an assumed acquisition by E-Town Capital.  Accordingly, the October 7th Forecast is purportedly an "assumed E-Town Capital Merger" forecast, as opposed to a forecast reflecting the Company's stand-alone business prospects.

72.     As reflected below, each of the Pre-November Forecasts contained significantly similar projections for Net Revenue, Gross Profit, EBITDA, Operating Income, EPS, Net Income, and GAAP EPS.  In other words, the differences in these metrics for all of the Pre-November Forecasts were minimal, particularly with respect to years 2017-2019.

73.     The following table shows the change in Net Revenue projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to significantly reduce Net Revenue projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

| NET REVENUE ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $206.30 | $261.00 | $325.00 | $395.40 | $479.90 | X |
| **July 9th Forecast** | $191.10 | $258.30 | $323.60 | $393.70 | $478.30 | X |
| **July 17th Forecast** | $191.60 | $258.90 | $324.30 | $394.60 | $479.10 | X |
| **August 17th Forecast** | $186.50 | $247.00 | $327.10 | $397.20 | $474.00 | X |
| **High/Low Difference** | $19.80 | $14.00 | $3.50 | $3.50 | $5.90 | X |
| | | | | | | |
| **November 5th Forecast** | $162.80 | $192.70 | $251.40 | $268.50 | $276.20 | $284.80 |
| **Drop From August 17th Forecast** | ($23.70) | ($54.30) | ($75.70) | ($128.70) | ($197.80) | X |
| **November 30th Forecast** | $169.70 | $170.20 | $248.40 | $266.70 | $274.00 | $282.60 |
| **Drop From August 17th Forecast** | ($16.80) | ($76.80) | ($78.70) | ($130.50) | ($200.00) | X |

74.     The following table shows the change in Gross Profit projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to

significantly reduce Gross Profit projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

| GROSS PROFIT ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $74.90 | $97.40 | $126.10 | $154.70 | $189.10 | X |
| **July 9th Forecast** | $69.40 | $94.30 | $124.50 | $153.30 | $188.40 | X |
| **July 17th Forecast** | $69.50 | $94.70 | $125.00 | $153.80 | $188.90 | X |
| **August 17th Forecast** | $68.00 | $93.00 | $129.20 | $154.70 | $186.80 | X |
| **High/Low Difference** | $6.90 | $4.40 | $4.70 | $1.40 | $2.30 | X |
| | | | | | | |
| **November 5th Forecast** | $59.00 | $72.20 | $96.20 | $102.40 | $109.80 | $113.40 |
| **Drop From August 17th Forecast** | ($9.00) | ($20.80) | ($33.00) | ($52.30) | ($77.00) | X |
| **November 30th Forecast** | $61.10 | $62.20 | $94.10 | $101.40 | $108.60 | $112.20 |
| **Drop From August 17th Forecast** | ($6.90) | ($30.80) | ($35.10) | ($53.30) | ($78.20) | X |

75.     The following table shows the change in EBITDA projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to significantly reduce EBITDA projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

///

///

///

///

///

| EBITDA ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $22.80 | $43.20 | $54.30 | $69.60 | $89.20 | X |
| **July 9th Forecast** | $20.90 | $43.10 | $56.10 | $70.40 | $90.80 | X |
| **July 17th Forecast** | $20.10 | $42.00 | $55.10 | $69.50 | $89.80 | X |
| **August 17th Forecast** | $19.40 | $41.70 | $60.80 | $71.70 | $89.10 | X |
| **High/Low Difference** | $3.40 | $1.50 | $6.50 | $2.20 | $1.70 | X |
| | | | | | | |
| **November 5th Forecast** | $14.00 | $22.50 | $34.50 | $38.40 | $45.90 | $50.30 |
| **Drop From August 17th Forecast** | ($5.40) | ($19.20) | ($26.30) | ($33.30) | ($43.20) | X |
| **November 30th Forecast** | $16.30 | $12.40 | $31.50 | $36.40 | $43.70 | $48.10 |
| **Drop From August 17th Forecast** | ($3.10) | ($29.30) | ($29.30) | ($35.30) | ($45.40) | X |

76.     The following table shows the change in Operating Income projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to significantly reduce Operating Income projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

| OPERATING INCOME ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $19.00 | $37.20 | $45.50 | $57.60 | $73.40 | X |
| **July 9th Forecast** | $16.10 | $35.70 | $45.90 | $57.00 | $73.60 | X |
| **July 17th Forecast** | $15.80 | $35.50 | $45.80 | $56.90 | $73.50 | X |
| **August 17th Forecast** | $15.00 | $35.20 | $51.40 | $59.20 | $72.80 | X |
| **High/Low Difference** | $4.00 | $2.00 | $5.90 | $2.20 | $0.80 | X |
| | | | | | | |
| **November 5th Forecast** | $8.50 | $15.30 | $26.30 | $28.80 | $34.50 | $36.90 |
| **Drop From August 17th Forecast** | ($6.50) | ($19.90) | ($25.10) | ($30.40) | ($38.30) | X |
| **November 30th Forecast** | $10.80 | $5.30 | $23.30 | $26.80 | $32.30 | $34.70 |
| **Drop From August 17th Forecast** | ($4.20) | ($29.90) | ($28.10) | ($32.40) | ($40.50) | X |

**CLASS ACTION COMPLAINT**

77.     The following table shows the change in EPS projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to significantly reduce EPS projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

| EPS | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $0.22 | $0.46 | $0.54 | $0.68 | $0.86 | X |
| **July 9th Forecast** | $0.18 | $0.45 | $0.56 | $0.68 | $0.87 | X |
| **July 17th Forecast** | $0.19 | $0.45 | $0.56 | $0.68 | $0.87 | X |
| **August 17th Forecast** | $0.17 | $0.44 | $0.63 | $0.71 | $0.86 | X |
| **High/Low Difference** | $0.05 | $0.02 | $0.09 | $0.03 | $0.01 | X |
| | | | | | | |
| **November 5th Forecast** | $0.10 | $0.19 | $0.31 | $0.33 | $0.39 | $0.42 |
| **Drop From August 17th Forecast** | ($0.07) | ($0.25) | ($0.32) | ($0.38) | ($0.47) | X |
| **November 30th Forecast** | $0.13 | $0.06 | $0.27 | $0.31 | $0.37 | $0.39 |
| **Drop From August 17th Forecast** | ($0.04) | ($0.38) | ($0.36) | ($0.40) | ($0.49) | X |

78.     The following table shows the change in Net Income projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to significantly reduce Net Income projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

///

///

///

///

///

///

**CLASS ACTION COMPLAINT**

| NET INCOME ($MM) | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $16.60 | $174.80 | $26.60 | $33.80 | $43.30 | X |
| **July 9th Forecast** | $14.30 | $174.10 | $27.30 | $34.00 | $43.90 | X |
| **July 17th Forecast** | $14.30 | $173.80 | $27.20 | $33.90 | $43.80 | X |
| **August 17th Forecast** | $13.40 | $173.50 | $30.60 | $35.20 | $43.40 | X |
| **High/Low Difference** | $3.20 | $1.30 | $4.00 | $1.40 | $0.60 | X |
| | | | | | | |
| **November 5th Forecast** | $7.50 | $153.50 | $15.40 | $16.90 | $20.30 | $21.80 |
| **Drop From August 17th Forecast** | ($5.90) | ($20.00) | ($15.20) | ($18.30) | ($23.10) | X |
| **November 30th Forecast** | $9.80 | $143.70 | $13.60 | $15.70 | $19.00 | $20.50 |
| **Drop From August 17th Forecast** | ($3.60) | ($29.80) | ($17.00) | ($19.50) | ($24.40) | X |

79.     The following table shows the change in GAAP EPS projections between the Forecasts, and clearly illustrates that the Board and Mattson management misleadingly agreed to significantly reduce GAAP EPS projections in the November Forecasts, after they realized that the Pre-November Forecasts would not support the fairness of E-Town Capital's revised offer:

| GAAP EPS | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **June 3rd Forecast** | $0.22 | $2.23 | $0.33 | $0.42 | $0.53 | X |
| **July 9th Forecast** | $0.18 | $2.22 | $0.34 | $0.42 | $0.54 | X |
| **July 17th Forecast** | $0.19 | $2.23 | $0.34 | $0.42 | $0.54 | X |
| **August 17th Forecast** | $0.17 | $2.21 | $0.39 | $0.44 | $0.53 | X |
| **High/Low Difference** | $0.05 | $0.02 | $0.06 | $0.02 | $0.01 | X |
| | | | | | | |
| **November 5th Forecast** | $0.10 | $1.98 | $0.20 | $0.21 | $0.25 | $0.27 |
| **Drop From August 17th Forecast** | ($0.07) | ($0.23) | ($0.19) | ($0.23) | ($0.28) | X |
| **November 30th Forecast** | $0.13 | $1.85 | $0.17 | $0.20 | $0.24 | $0.25 |
| **Drop From August 17th Forecast** | ($0.04) | ($0.36) | ($0.22) | ($0.24) | ($0.29) | X |

80.     As explained below, none of the significant downward revisions to the November Forecasts as compared to the Pre-November Forecasts were warranted by Mattson's actual long-term business prospects.

**CLASS ACTION COMPLAINT**

81.     E-Town Capital purportedly cited the general decline in the semiconductor industry and the Company's near term prospects and the Company's recent stock price decline as reasons for its significantly decreased October 19, 2015 offer of $3.20 per share.   But, as indicated below, both the Individual Defendants and various analysts expect the Company's future financial performance to remain strong despite the temporary decline in the industry.

82.     Recognizing that the Company's Pre-November Forecasts would not support accepting E-Town Capital's revised offer, that they had inexplicably squandered the opportunity to sell the Company for a significantly higher price for the time being, and eager to finalize a deal, Mattson management and the Board realized that they would once again have to revise their Forecasts in order to justify a lower sale price.   This time, however, the downward revisions would need to be much more drastic.

83.     Accordingly, on November 5, 2015, a mere two weeks after learning that E-Town Capital had significantly reduced its previous offer, Mattson management prepared and the Board approved the November 5th Forecast.  The November 5th Forecast contained the following projections:

**Mattson Management Projections — November 5, 2015**
($MM, except EPS)

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Net Revenue | $162.8 | $192.7 | $251.4 | $268.5 | $276.2 | $284.8 |
| Gross Profit | 59.0 | 72.2 | 96.2 | 102.4 | 109.8 | 113.4 |
| EBITDA excluding stock based compensation *(1) | 14.0 | 22.5 | 34.5 | 38.4 | 45.9 | 50.3 |
| Operating Income (2) | 8.5 | 15.3 | 26.3 | 28.8 | 34.5 | 36.9 |
| EPS (1)(2) | 0.10 | 0.19 | 0.31 | 0.33 | 0.39 | 0.42 |
| Depreciation and Amortization | 3.2 | 4.3 | 4.5 | 5.1 | 6.1 | 7.3 |
| Capital Expenditures | 2.1 | 4.0 | 6.0 | 8.0 | 10.0 | 10.0 |
| Working Capital Increase (Ex-Cash) | (4.8) | 14.8 | (2.4) | 6.0 | 0.2 | 5.2 |
| Stock-Based Compensation | 2.3 | 2.9 | 3.7 | 4.5 | 5.3 | 6.1 |

*     For purposes of valuation measure, f/x gain/loss was added back to EBITDA
(1)   Non-GAAP metric
(2)   Excludes restructuring and non-cash taxes

84.     Mattson management subsequently prepared, and the Board approved, the November 30th Forecast, which, as shown above, was substantially similar to the projections set forth in the November 5th Forecast:

**CLASS ACTION COMPLAINT**

**Mattson Management Projections — November 30, 2015**
($MM, except EPS)

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Net Revenue | $169.7 | $170.2 | $248.4 | $266.7 | $274.0 | $282.6 |
| Gross Profit | 61.1 | 62.2 | 94.1 | 101.4 | 108.6 | 112.2 |
| EBITDA excluding stock based compensation *(1) | 16.3 | 12.4 | 31.5 | 36.4 | 43.7 | 48.1 |
| Operating Income (2) | 10.8 | 5.3 | 23.3 | 26.8 | 32.3 | 34.7 |
| EPS (1)(2) | 0.13 | 0.06 | 0.27 | 0.31 | 0.37 | 0.39 |
| Depreciation and Amortization | 3.2 | 4.3 | 4.5 | 5.1 | 6.1 | 7.3 |
| Capital Expenditures | 2.1 | 4.0 | 6.0 | 8.0 | 10.0 | 10.0 |
| Working Capital Increase (Ex-Cash) | (5.6) | 10.1 | 0.5 | 5.9 | 0.2 | 5.0 |
| Stock-Based Compensation | 2.3 | 2.9 | 3.7 | 4.5 | 5.3 | 6.1 |

\*   For purposes of valuation measure, f/x gain/loss was added back to EBITDA
(1)  Non-GAAP metric
(2)  Excludes restructuring and non-cash taxes

85.    As indicated above, compared to the Pre-November Forecasts, the November Forecasts showed significantly lower projections for Net Revenue, Gross Profit, EBITDA, Operating Income, EPS, Net Income, and GAAP EPS, including for 2017-2020.[2]

86.    Management purportedly believed that a sudden and significant downward revision to the Pre-November Forecasts was necessary because of a decline and loss of opportunities in the DRAM market and decreased demand for the Company's strip and RTP products.

87.    Yet according to the Form 10-Q the Company filed on November 2, 2015, the Company's "dry strip products, including our Suprema XP, continue to make a steady contribution to our business as our established customers in foundry/logic and memory continue to make investments."  The Company also stated "[t]he increase of $0.5 million in net revenue during the three months ended September 27, 2015, as compared to the three months ended September 28, 2014, was mainly attributable to higher overall net revenue of our strip systems to the memory sector and an increase in our spare parts and service revenue."  The Company also stated "[o]ur conventional RTP product, the Helios XP, has established industry leading technical performance in 20 nanometer foundry/logic and memory volume production sites with its dual side wafer heating and differential thermal energy control.  As the transition to sub-20

---

[2] Although the Pre-November Forecasts did not specifically project for 2020, it can be presumed that if they had, the projections for 2020 would have been close to the projections for 2019.

**CLASS ACTION COMPLAINT**

nanometer and 3D technologies ramps up, we anticipate increasing shipments of our Helios products into both the memory and foundry/logic segments."

88.  On October 29, 2015, Individual Defendant Chen hosted an earnings call[3] to discuss the Company's third quarter results and provide information on the Company's future business environment.  On the call, Chen stated:

> I'm pleased to announce like even in today's rapidly changing environment.  Mattson has continued to achieve profitable quarterly results.  For the third quarter, we report revenue at the top of our guidance range, finishing the quarter at $39 million. Year-to-date, we have a revenue of $140 million, which is 14% higher than the same period last year.
>
> Our earnings exceeded, our guidance range, closing the quarter track with the prior quarter at $0.03 per share.  Also, we continue to strengthen our balance sheet, as working capital as increased to $79 million and that we ended the quarter with $39 million in cash.

89.  With respect to the DRAM market, Chen stated:

> Year-to-date, we have increased cash by $14 million. We know push-out of the DRAM capacity to go up, which began in the second quarter, will continue into next year… Looking at 2016 by major customer segment, we expect DRAM customers to remain cautious in the first half of 2016. **When you say equipment spend is limit to 20 nanometer capacity addition on demand for DRAM products increase**.

90.  In other words, Chen indicated that while the Company expects a "push out" of DRAM orders and a decrease in demand in the DRAM market to continue into the first half of 2016, the Company only expects the decreased demand to be short-lived.

91.  Chen confirmed this belief later on the October 29th earnings call.  In response to a question concerning future orders for mobile DRAM, Chen stated: At this moment actually we believe, at this moment I think is possible in Q1 because if you look at it DRAM the growth rate is the big growth is more than 10% a year.  And this delay investment already a couple of

---

[3] *Mattson Technology's (MTSN) CEO Fusen Chen on Q3 2015 Results – Earnings Call Transcript*, SEEKING ALPHA (Oct. 29, 2015 9:13PM), http://seekingalpha.com/article/3623496-mattson-technologys-mtsn-ceo-fusen-chen-q3-2015-results-earnings-call-transcript.

**CLASS ACTION COMPLAINT**

1   quarters, so sometime down the line, **we believe is going to pick up**.  Already three quarter, so

2   quite possible this can be Q1, if not Q1 I -- we will think Q2 will take place."

92.   In response to another question concerning future revenues, Chen commented that

"**sometime down the line this DRAM investment will return, I think [etch] is going to be**

**bright spot for us**.  In the meantime, as you know, we're focused on our service business."

93.   With respect to demand for the Company's strip products, Chen stated:

> Mattson's strip product provide increased revenue quarter-over-
> quarter from foundry logic customers and continue to enjoy the
> broadest customer base of all our products. In the third quarter, it
> remains the key driver for Mattson System revenue.

94.   In other words, Mattson management's stated rationale behind revising the

November Forecasts dramatically downward as compared to earlier Pre-November Forecasts is

entirely inconsistent with the statements concerning the Company's business operations

contained in the Company's 10-K filed on November 2, 2015 and statements made by Individual

Defendant Chen during the October 29, 2015 earnings call.

95.   On November 4, 2015, Mattson also reported results for the third quarter.  The

Company reported: Net revenue for the third quarter of 2015 of $38.9 million was in-line with

previously issued guidance; Gross margin in the third quarter of 2015 was in-line with previously

issued guidance at 35 percent; Net income for the third quarter of 2015 was $2.0 million, or

$0.03 per diluted share, and exceeded previously issued guidance and represented the ninth

consecutive profitable quarter on a non-GAAP basis.   The results topped Wall Street

expectations.

96.   Commenting on the strong third quarter results, Individual Defendant Chen

stated:  "In spite of challenging industry conditions, I am pleased with our ability to achieve top

line results at the high end of expectations,…Further, our flexibility in managing our cost

structure to align with changes in industry demand, without sacrificing our focus on our

customers' success, enabled us to exceed our own expectations for profitability."  Yet the very

next day, on November 5, 2015, Chen suddenly decided it was necessary to drastically revise the

Pre-November Forecasts downwards.

28

97.     At worst, the Company's 10-Q and Chen's public statements indicate a temporary "push-out" of orders for DRAM in 2016.  But Chen and the Company fully expect DRAM orders and demand to pick-up again in the not too distant future.  Yet Mattson management and the Board dramatically decreased not only their projections for 2016, but also for 2017-2020.

98.     Furthermore, in a report issued on October 12, 2015, analysts at Craig-Hallum Capital Group LLC wrote that if Taiwan Semiconductor Manufacturing Company, Limited ("TSM") another publicly-traded semiconductor company, is able to secure a deal to produce a significant portion of the chips used in Apple's next generation iPhone and other products, such a deal would be "the most positive impact in 2016" and would meaningfully drive Mattson sales. And on October 21, 2015, public news reports indicated that TSM's chips offer superior battery life compared to those made by competitors.  Accordingly, reports indicate that TSM is likely to be named the exclusive supplier of Apple's upcoming A10 chips, which are expected to start production in March 2016.  As a result, Mattson is likely to generate significant revenues in the second half of 2016 and onwards.  Although the Board and management were aware of this information as of at least October 2015, they nonetheless agreed to improperly revise the Pre-November Forecasts significantly downward in order to justify E-Town Capital's low-ball offer.

99.     Additionally, in an October 29, 2015 report, analysts at Cowen and Company noted that while the Company will face certain challenges in 2016 as a result of less robust DRAM spending, the Company is still expected to see 10-15% growth in services.  Accordingly, Cowen analysts expect Mattson to outperform expectations, as a result of: 1) leverage to key technology transitions at Samsung and TSMC (Sub 20nm FinFET and 3D NAND) with strong product portfolio/IP in RTP/MSA, which is expected to play a key role in improving wafer yield; 2) Favorable secular backdrop given rapid industry consolidation which is motivating customers (Intel, Samsung, TSMC) to help smaller companies stay alive and succeed; and 3) recent financing that should allow the Company to develop more evaluation systems which should ultimately allow it to broaden its customer penetration with other key customers.  The Cowen report also stated that its analysts expect "**a very strong year in '17 on the back of DRAM snap-back and MSA 10nm qualifications**."

**CLASS ACTION COMPLAINT**

1    100.    Furthermore, the Board and Mattson management have intentionally overblown

2 the impact the recent decrease in DRAM spending will have on the Company's long-term

3 financial prospects.    In an October 30, 2015 report, analysts at Craig-Hallum stated

4 "Management expects the challenging environment to continue into Q1 of next year, however

5 **they expect Q4 to be the bottom.  Management is optimistic that despite the slow start to**

6 **next year they will still see revenue growth on a year over year basis**."

7    101.    In the same report, Craig-Hallum analysts wrote that signs of increased DRAM

8 spending by Mattson's largest customers, including Hynix and Samsung, would cause them to

9 share in management's optimism for year over year revenue growth.   And according to a

10 November 2015 research note from Morgan Stanley analyst Shawn Kim, the DRAM downturn at

11 Hynix over the past few quarters is "nothing to fear."  Specifically, Kim wrote:

12        Our channel checks show DRAM inventory depletion to normal
13        levels for the first time in six months, which **sets up for better
         supply demand**. **We do not expect this year's customer draw
14        down of inventory to repeat in 2016 and see improvements**
         including: (i) DRAM capital spending expectations have come
15        down sharply, (ii) supply surprise on the downside in 2015 due to
         high capital spending levels, and (iii) DRAM content per phone
16        and server should still rise in 2016, vs. our previously more
17        cautious expectations.

18    102.    Accordingly, the November Forecasts rely upon flawed and inaccurate

19 assumptions about the Company's long-term financial performance, which Defendants know are

20 inaccurate and unfounded.  Specifically, the November Forecasts reflect a false assumption that

21 the Company's long-term business prospects, including through 2017-2020, have been

22 significantly diminished as a result of the 2015 DRAM market decline.   In reality, the

23 Company's own SEC filings and the public statements made by Individual Defendant Chen, as

24 well as various analyst reports and news reports, indicate that: (i) the decrease in the DRAM

25 market is only expected to last a short while longer, and that "DRAM investment will return" or

26 "pick up" over the long-term; (ii) the Company's long-term financial prospects remain strong;

27 and thus, (iii) the decision by the Board and management to drastically revise the Pre-November

28

**CLASS ACTION COMPLAINT**

1   Forecasts downward was not supported by the Company's actual long-term business prospects,

2   which are misleadingly portrayed by the November Forecasts.

3       103.   Despite knowing that the November 30th Forecast did not accurately reflect the

4   Company's long-term business prospects, Company management and the Board approved the

5   November 30th Forecast and authorized representatives of Morgan Stanley to use the November

6   30th Forecast in connection with preparing its valuation analyses and fairness opinion.

7       104.   In sum, Defendants know that the Proxy misleadingly portrays the "recent

8   significant decline in the DRAM market" as supporting Defendants' decision to revise the Pre-

9   November forecasts drastically downward, misleadingly states that the November 30th Forecast

10  reflects managements "best estimate of the Company's future prospects based on current

11  estimated demand for the Company's customers," and misleadingly states that the November

12  30th Forecast was therefore appropriate to provide to Morgan Stanley for purposes of preparing

13  its fairness opinion.  In reality, the Board knows that management's Pre-November Forecasts,

14  including the August 17th Forecast, more accurately reflect the Company's long-term future

15  prospects.

16      105.   Indeed, Mattson management and the Board had previously indicated their belief

17  in the long-term accuracy of the August 17th Forecast.  The August 17th Forecast was prepared

18  by Company management in anticipation of a due diligence meeting held on August 17, 2015,

19  with representatives of E-Town Capital, the Company and their respective advisors.  The Board

20  and management then agreed to deliver the August 17th Forecast to E-Town Capital on August

21  24, 2015, so that it could evaluate the Company's long-term prospects in connection with

22  evaluating a merger.  The August 17th Forecast included an update to the long-term financial

23  outlook of the Company depicted in the July 17th Forecast and reflected minor adjustments

24  based upon decreased projected sales for the Company's strip and etch products and delays in

25  shipments for sold strip and etch units, in each case based on input from the Company's division

26  managers.

27      106.   Further, at the very least, the Board was aware of the statements contained in the

28  Company's 10-K, the public statements made by Individual Defendant Chen during the October

29, 2015 earnings call, and the publicly available analyst reports and news reports referenced above, which directly contradict management's purported rationale for drastically revising the Pre-November Forecasts downwards.  In other words, the Board knows that the Company's long-term prospects are not nearly as bleak as they are portrayed in the November 30th Forecast, particularly because "DRAM investment will return" or "pick up" in the near future.

107.   The Board and management intentionally revised the Pre-November Forecasts, including the August 17th Forecast, drastically downward in order to justify accepting E-Town Dragons' significantly lower offers, which they first received on October 19, 2015.

108.   As discussed below, the Board squandered the opportunity to sell the Company at a much higher price, and needed to save face by making E-Town Capital's revised low-ball offers appear adequate.  And, as noted above, despite the inadequate Merger Consideration, each of the Individual Defendants will nonetheless reap significant personal financial gain as a result of the Proposed Transaction, and they are thus personally motivated to ensure that the Merger is consummated.

**As A Result of the Flawed Sales Process, Defendants Needed to Justify Accepting a Significantly Lower Offer**

109.   The Board inexplicably squandered multiple opportunities to sell the Company for a significantly higher price during the months preceding the announcement of the Proposed Transaction.

110.   On May 26, 2015, E-Town Capital submitted an initial indication of interest to acquire the Company at a price per share of $4.00 - $4.50 in cash.

111.   On May 28, 2015, the Board established a Strategic Transaction Assistance Committee in order to assist and make recommendations to the Board with respect to the day-to-day decisions as to process and strategy concerning an assessment of any potential strategic transaction.  The Board inexplicably appointed Individual Defendant Chen as one of the three members of the Assistance Committee, despite the fact that he is not an outside director and the

**CLASS ACTION COMPLAINT**

1  fact that he stood to receive significant personal financial benefits in connection with a sale of
2  the Company.

3      112.    Around June 5, 2015, a mere six months before agreeing to accept E-Town
4  Capital's low-ball $3.80 offer, the Board had indicated that it would only be willing to entertain a
5  merger at a price per share greater than $6.00.

6      113.    Also on June 5, 2015, the Board instructed its counsel to prepare a management
7  neutrality policy setting forth guidelines to purportedly "ensure" that members of senior
8  management remained neutral with respect to any strategic bidders and refrain from engaging in
9  discussions or activities that would indicate that they favored one bidder over another.  It is
10 unclear what prompted the Board to believe that such a policy was necessary, but presumably
11 there was a basis for being concerned that management would not maintain the appropriate level
12 of neutrality during the strategic review process and would not place stockholders' interests
13 above their own personal interests.  Such a policy is mere window-dressing, designed to provide
14 a false sense of security to stockholders that the sales process was not tainted by management's
15 personal preferences.

16     114.    On June 11, 2015, E-Town Capital submitted a revised indication of interest
17 proposing to acquire the Company at a price per share in the range of $4.75 - $5.25.

18     115.    On June 12, 2015, the Board countered with a proposed purchase price of $5.50 -
19 $6.00 per share.   The Board's counter proposal presumably took into account Mattson
20 management's most recently revised projections, which were prepared on June 3, 2015.

21     116.    On June 15, 2015, E-Town Capital indicated that it would not raise its offer above
22 the proposed range of $4.75 - $5.25 per share.

23     117.    On July 23, 2015, E-Town Capital indicated that it would be lowering its
24 proposed purchase price range to $4.00 - $4.25 per share.

25     118.    On August 3, 2015, E-Town Capital submitted a revised proposal to acquire the
26 Company at a price per share of $4.10.

27

28

**CLASS ACTION COMPLAINT**

119.    For all of August, all of September, and half of October, the Board inexplicably dragged its feet on getting a deal done with E-Town Capital at its $4.10 offer price or pursuing any other meaningful strategic alternatives.

120.    The inept Board may have been improperly hung-up on E-Town Capital's unwillingness to agree to the acceleration of their equity awards because E-Town Capital believed that continued vesting after closing, as opposed to acceleration at closing, would provide an incentive for employees to remain with the Company both through closing of the transaction and after such closing.    Ultimately, the Board was able to negotiate accelerated vesting for each member except for Chen, which provides the Individual Defendants with significant personal financial benefits in the form of lucrative cash payments.

121.    While the Board dragged its feet on finalizing a deal with E-Town Capital, on September 15, 2015 the Board also inexplicably decided not to contact other potentially interested bidders.

122.    More than a month later, the Board had still been unable to finalize a deal with E-Town Capital and had declined to meaningfully pursue a transaction with any other company. And on October 19, 2015, E-Town Capital once again indicated that it intended to lower its proposed purchase price to $3.20 per share.    E-Town Capital purportedly cited the general decline in the semiconductor industry and the Company's near term prospects as the basis for decreasing its previous offer by 22%.

123.    The Board and Mattson management recognized that they had inexplicably squandered, for the time being, the opportunity to sell the Company at a significantly higher price, and also recognized that their Pre-November Forecasts would not support the fairness of a merger at any price around E-Town Capital's most recent offer.    The Board and Mattson management thus decided to revise their previous Forecasts drastically downward, and prepared the November 5th Forecasts and November 30th Forecasts.

124.    On November 5, 2015, E-Town Capital made its final offer to acquire the Company for $3.80 per share, significantly below the $4.75 - $5.25 indication of interest E-Town Capital had submitted a mere five months earlier.

**CLASS ACTION COMPLAINT**

125.    The Board then agreed to provide the dramatically lower November 30th Forecast to Morgan Stanley in order for it to prepare its financial analyses showing that the drastically lower Merger Consideration is "fair" to Mattson stockholders.

126.    As discussed above, the Board and Mattson management know full-well that the November 30th Forecast does not accurately reflect the Company's long-term business prospects. Indeed, between September 25, 2015 and November 27, 2015 the Company's stock price increased by over 38%, yet the Board nevertheless falsely claimed that the November 30th Forecast accurately reflected the Company's long-term prospects.

## CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Mattson common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

128.    This action is properly maintainable as a class action for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable.  As of October 28, 2015 there were over 33.5 million outstanding shares of Mattson common stock. The holders of these shares are believed to be geographically dispersed throughout the United States;

(b)    There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

    i.    Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

    ii.    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Merger without

35

receiving the material information referenced above and the Proposed Transaction is consummated as presently anticipated.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

129.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

130.     Defendants have filed the Proxy with the SEC with the intention of soliciting Mattson stockholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above and contains the materially misleading statements referenced above.

**CLASS ACTION COMPLAINT**

131.   In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Mattson, were aware of the omitted information but failed to disclose or correct such information, in violation of Section 14(a).

132.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

133.   Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts or makes materially false and misleading statements concerning: (i) the sales and negotiation process, including whether certain interested parties are subject to standstills and the identity of the individuals involved in negotiations for E-Town Dragon; (ii) the financial analyses conducted by Morgan Stanley in support of its fairness opinion; and (iii) estimated forecasts of the Company's future financial performance.  Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Morgan Stanley reviewed and discussed its financial analyses with the Board during various meetings including on December 1, 2015, and further states that the Board relied upon Morgan Stanley's financial analyses and fairness opinion in connection with approving the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

134.    As a direct result of Defendants' intentional, reckless, or negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the Class will be prevented from meaningfully exercising their right to seek appraisal and/or cast an informed vote on the Proposed Transaction.

135.    At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts and material information referenced above.

136.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction and would view a full and accurate disclosure of the information referenced above as having significantly altered the total mix of information available.  Plaintiff and the Class will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

137.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

138.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

139.    The Individual Defendants acted as controlling persons of Mattson within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Mattson and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

140.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy, Forecasts, and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

141.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

142.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

143.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

144.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**CLASS ACTION COMPLAINT**

145.    Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with the stockholder vote on the Proposed Transaction or otherwise consummating or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C.    Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 18, 2016.

*/s/ David E. Bower*
David E. Bower

David E. Bower SBN 119546
Barbara A. Rohr SBN 273353
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: dbower@faruqilaw.com
            brohr@faruqilaw.com

**CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Juan E. Monteverde
Miles D. Schreiner
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
Email: jmonteverde@faruqilaw.com
          mschreiner@faruqilaw.com

*Attorneys for Plaintiff*

**CLASS ACTION COMPLAINT**

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Brent Talbert ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed a draft complaint against Mattson Technology, Inc. ("Mattson") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.   Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.   Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.   Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.   Plaintiff's transactions in Mattson securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.   In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below:

7.   Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this _8th_ day of February, 2016.

_Brent Talbert_
Brent Talbert

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 2/20/15 | $4.567 | 315 |
| " | 2/26/15 | $4.85 | 400 |
| " | 2/27/15 | $4.95 | 150 |
| " | 6/29/15 | $3.3767 | 400 |
| " | 8/03/15 | $2.6768 | 500 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |